In re COMMERCIAL INVESTMENTS, LTD., dba Territorial Custom Homes, Employer ID No. 85–0165436, Debtor.

SECURITY FEDERAL SAVINGS & LOAN ASSOCIATION OF ALBUQUERQUE, a national stock association, Plaintiff,

v.

COMMERCIAL INVESTMENTS, LTD., dba Territorial Custom Homes, a New Mexico corporation, et al. (including Mitchell), Defendants.

Bankruptcy No. 7–87–01882 M A.
Adv. No. 88–0023 M.

United States Bankruptcy Court,
D. New Mexico.

April 17, 1989.

James C. Jacobsen, Albuquerque, N.M., for debtor.

Thomas A. Simons IV, Santa Fe, N.M., Ruth M. Schifani, Albuquerque, N.M., for plaintiff.

Deborah H. Mande, Albuquerque, N.M., for Western.

Myra C. Lynch, Albuquerque, N.M., for CST.

Richard E. Norton, Corrales, N.M., for Barraza.

### MEMORANDUM OPINION AND ORDER

MARK B. McFEELEY, Bankruptcy Judge.

This matter came before the Court for hearing on plaintiff Security Federal Savings & Loan Association of Albuquerque's Motion for Summary Judgment on the counterclaim of CST Group. Having considered the arguments of the parties and the affidavits and exhibits submitted therewith, the Court finds that there are no material questions of fact and that plaintiff is entitled to summary judgment.

FINDINGS OF FACT

1. In 1981 Margaret Chavez purchased certain real property (the "land") in Albuquerque, New Mexico.

2. On January 1, 1984 Margaret Chavez, Robert S. Sanchez, Jr., Joanne Sanchez, Lina M. Trujillo, Joseph Mark Chavez and Mary Jane Chavez (the "partners") entered into the CST Group partnership for the purpose of developing the land. Under the terms of the partnership agreement each partner had an equal right to manage the business.

3. After January 1, 1984 Margaret Chavez oversaw the development of the land property and replatted it into a subdivision of ten lots.

4. On or about July 1, 1984 the partners amended the partnership agreement to appoint Margaret Chavez as the "managing partner" for financial affairs. This amendment stated, in part, "Margaret T. Chavez is hereby given authority to sign notes and mortgages on behalf of CST Group. All the parties named in the original Partnership Agreement, however, remain liable for payment of same."

5. On or about August 31, 1984 Margaret Chavez executed a warranty deed for the land to CST Group. Between August 29, 1984 and September 3, 1984 the remaining five partners also executed warranty deeds for the property, naming CST Group as grantee.[1] These deeds were filed for record on September 5, 1984.

6. In March of 1985, CST Group sold lot 4 to a third party.

7. On December 16, 1985 CST Group entered into the Villa Palomar joint venture agreement with Commercial Investments, Ltd. ("CIL"), now the debtor in this bankruptcy. A portion of that agreement reads:

WHEREAS, CST desires to enter into a joint venture agreement with CIL for the purpose of acquiring financing for the construction and selling of custom single-family residences on the property.

NOW THEREFORE, the parties to this Agreement, in consideration of mutual confidence and stipulations set out herein, agree as follows:

1. CST agrees to the assignment of the property to Villa Palomar Joint Venture.

2. CIL agrees to coordinate, manage, and oversee the construction of the homes on the property, and otherwise act as the general contractor.

3. CST agrees to permit the use of nine (9) of the lots currently owned by CST Group to be used as security for construction financing.

4. The parties to this Agreement agree to share equally in loan principal and interest costs of interim financing, as well as in all other legitimate costs associated with the construction and sale of homes on the property.

5. The parties to this Agreement agree to share equally in the net profits of the joint venture.

6. The parties further agree to accelerated release of the lots by the bank until the entire obligation to the bank is completely satisfied.

7. The parties to this Agreement agree that any questions which may arise, or any major decisions to be made as this venture progresses, will be resolved to the mutual satisfaction of the managing partners, Margaret T. Chavez and Wayne Crooks.

8. *Time of Performance.* This joint venture shall begin with the execution of this Joint Venture Agreement and shall continue for the duration of the construction of the improvements (homes), estimated to be a 15–month period ending on or before March 31, 1987.

The agreement was executed by Margaret Chavez for CST Group and Wayne, Crooks for CIL.

8. On or about March 15, 1986 the six partners listed both individually and as "d/b/a CST Group, a New Mexico General Partnership", executed a warranty deed for

---

**1.** The record is unclear why these deeds were executed. Record title had been in Margaret Chavez' name only.

the land, granting "to CST Group, a New Mexico General Partnership, an undivided one-half (½) interest, and Commercial Investments, Ltd., a New Mexico Corporation, an undivided one-half (½) interest, d/b/a VILLA PALOMAR, a New Mexico Joint Venture." This deed was filed for record on March 20, 1986.

9. Contemporaneously with the partners' execution of the warranty ,deed to Villa Palomar each partner, at Crooks' request, signed a loose sheet of paper. This sheet stated:

IN WITNESS WHEREOF, we have hereunto set our hands and seals this 15th day of March, 1986.

JOSEPH MARK CHAVEZ

MARY JANE CHAVEZ

ROBERT S. SANCHEZ, JR.

JOANNE M. SANCHEZ

LINA M. TRUJILLO

MARGARET T. CHAVEZ

The only other contents on the sheet was a space for a notary public's acknowledgment. No partner questioned Crooks regarding this sheet or its purpose.

10. On or about April 7, 1986 a POWER OF ATTORNEY, consisting of two pages, was recorded with the County Clerk, naming Wayne Crooks as the six partners' attorney-in-fact. A portion of this document follows:

This is a Limited Power of Attorney. We grant unto our said attorney-in-fact, Wayne R. Crooks, the power to sell for us any interest we have or claim in the following described real property ... (the land)

Our attorney-in-fact is authorized to make, receive, sign endorse, execute, acknowledge, deliver and possess such applications, contracts, purchase agreements, options, covenants, conveyances, deeds, trust deeds, security agreements, bills of sale, leases, mortgages, assignments and insurance policies and to execute releases and satisfaction of mortgages, liens, judgments, security agreements and other debts and obligations and such other instrument in writing of whatever kind and nature, including the execution of deeds, real estate contracts, notes, addendums to real estate purchase agreements and other documentation as may be necessary or proper in the exercise of the rights and powers herein granted.

The rights, powers and authority of said attorney-in-fact herein granted shall commence and be in full force and effect on March 15, 1986, and such rights, powers and authority shall remain in full force and effect thereafter until this Power of Attorney is specifically withdrawn by an instrument in writing.

GIVING AND GRANTING unto our said attorney full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in and about the premises as fully, with the same force and effect, and to all intents and purposes, as we might or could do if personally present, with full power of substitution and revocation, .hereby ratifying and confirming all that our said attorney or his substitute shall lawfully do or cause to be done by virtue hereof.

Page two of the power of attorney is the loose sheet of paper signed earlier by all the partners. None of the partners knew that Crooks would attach the signature page to a power of attorney. At the time, no partner was aware that this power of attorney had been recorded.

11. CIL proceeded to build houses on lots 3, 6, 7 and 8.

12. On or about August 21, 1986 a warranty deed for Lot 7 was executed from "CST Group, a New Mexico General Partnership, an undivided one-half (½) interest, and Commercial Investments, Ltd., a New Mexico Corp., an undivided one-half (½) interest, dba VILLA PALOMAR as [sic] New Mexico Joint Venture" to Richard E. and Linda L. Howell. This deed was signed by Wayne R. Crooks for both CIL

and CST Group. The acknowledgment for CST reads:

The foregoing instrument was acknowledged before me this 21st day of August, 1986, by CST Group by: Wayne R. Crooks as Attorney in fact for [the six partners], Partners of CST Group, a New Mexico General Partnership.

This deed was recorded on August 22, 1986.

13. CST received no proceeds from the sale of lot 7.

14. On September 4, 1986 Wayne R. Crooks executed another warranty deed from CST and CIL dba Villa Palomar to Commercial Investments Ltd. for lots 1, 2, 3, 5, 8 and 9. Wayne R. Crooks signed the deed for CST as "President". The acknowledgment section, as in the August 21, 1986 deed, refers to Crooks as "Attorney in fact" for the partners.

15. On or about September 5, 1986, CIL granted Security Federal a mortgage on lots 1, 2, 3, 5, 8 and 9.

16. On February 25, 1987 CIL granted a mortgage to Security Federal on Lot 2.

17. On April 8, 1987 CIL and CST Group, dba Villa Palomar granted a mortgage to Security Federal on Lots 1, 5, 9 and 10. Crooks signed for both CIL and CST Group. Crooks acknowledged for CST Group as its "Attorney in Fact."

18. None of the partners of CST ever signed the notes or mortgages.

19. The deposition of Bobby Nafus, the loan officer at Security Federal, indicates the following:

a. From his dealings with Mr. Crooks he understood that Crooks was the owner of the land "along with this group that he was representing and also had the power of attorney to do so." p.8

b. He never saw the joint venture agreement.

c. The title binder for the loan on lots 1, 2, 3, 5, 8 and 9 indicated that CST had an ownership interest in the land. p.10 *See also* Exhibit CST–5.

d. He received a copy of the power of attorney document from the title company. p.12.

e. He was not aware of anything unusual about the closing documents. p.16.

f. The title company informed him that Crooks had a power of attorney from CST group and the Crooks was representing CST. p.22.

20. The loan file for the April 10, 1987 loan contained a copy of the power of attorney document stapled to a memo dated July 8, 1987.

21. On July 10, 1987 the six partners caused a "Revocation of Power of Attorney" to be filed with the County Clerk.

22. CIL filed for relief under Chapter 7 of the Bankruptcy Code. Security Federal filed this adversary proceeding to foreclose on its February 25, 1987 note and mortgage for lot 2. CST has counterclaimed, seeking judgment against Security Federal for actual damages as a result of negligence, punitive damages, and damages for slander of title, plus fees and costs and title evidence.

23. CST has alleged:

a. Between September 4, 1986 and April, 1987 Security Federal negligently engaged in 5 transactions involving lots 1, 2, 3, 5, 8, 9 and 10 in wanton disregard of CST's ownership rights.

b. Security Federal knew or should have known that CST owned the lots.

c. Security Federal knew that on March 15, 1986 CST purportedly granted an undivided one-half interest in the lots to CIL for "limited purposes."

d. Title insurance commitments for the loans set forth the respective undivided one-half ownership interests of CST and CIL dba Villa Palomar.

e. That all loans were negligently prepared to CIL only, in derogation of CST's rights.

f. That Security Federal's negligence resulted in the conversion of all proceeds.

g. That the April, 1987 loan was made for lots which had no purchase agreements.

h. That Security Federal negligently accepted the signature of Crooks as attorney in fact.

i. That CST did not knowingly grant a power of attorney to Crooks.

j. The loans were made without notice to CST and without following standard and appropriate procedures.

*Discussion*

Federal Rule of Civil Procedure 56(c) provides, in part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

■ Summary judgment is an integral part of the Federal Rules of Civil Procedure, which are intended to " 'secure the just, speedy and inexpensive determination of every action.' " *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R. Civ.P. 1). A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Although the material submitted by the parties in support of and in opposition to the motion must be construed liberally in favor of the party opposing the motion, *Harsha v. United States*, 590 F.2d 884, 887 (10th Cir.1979), the burden on the moving party may be discharged by demonstrating the absence of evidence to support an essential element of the nonmoving party's case. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. In such a situation, the moving party is entitled to judgment as a matter of law, "because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 323, 106 S.Ct. at 2553.

Security Federal has moved for summary judgment on CST's counterclaim. As grounds, Security Federal claims it was a *bona fide* purchaser for value under its mortgage, is not chargeable with any fraud alleged by CST, and that it holds a valid first mortgage on the land. In response, CST claims that there are 5 genuine issues of material facts which bear directly on Security Federal's assertion of *bona fide* purchaser status. Each will be discussed.

*1. Whether the power of attorney was an altered and fraudulent document.*

CST claims that an evidentiary hearing is required to authenticate the power of attorney. The Court disagrees. All partners admit that their signatures appear on the document. *See* Deposition of Robert Sanchez, p. 18 line 14 and line 24; Deposition of Maryjane Chavez, p. 8 line 1; Deposition of Joseph Mark Chavez, p. 9 line 1; Deposition of Joanne M. Sanchez, p. 6 line 8; Deposition of Luna M. Trujillo, p. 12 line 11; Deposition of Margaret T. Chavez, p. 55 line 11 and page 57 line 11 and line 18. The document was filed for record. The issue is not whether the document was altered and fraudulent; rather, the issue is the legal affect of the recorded document. Under New Mexico law a bona fide purchaser for value takes free of defects that are unknown to the purchaser and not discoverable in the exercise of ordinary care. *State v. Garcia*, 77 N.M. 703, 709, 427 P.2d 230 (1967). Even if the power of attorney were both altered and fraudulent, Crooks could cut off CST's interests through a conveyance to a bona fide purchaser for value. *See e.g. International State Bank v. Bray*, 87 N.M. 350, 352, 533 P.2d 583, 585 (1975). Therefore, no evidentiary hearing is required to authenticate the power of attorney document because its authenticity is not relevant to Security Federal's motion.

*2. Whether a power of attorney executed by the partners individually could authorize Crooks to act on behalf of the partnership.*

■ The Court finds this to be a purely legal question. It therefore is not an impediment to the summary judgment motion. The Court finds, however, that

Crooks could act as he did to encumber the land.

The record shows that all six partners granted to Crooks a power of attorney to deal with the land. Under New Mexico law a single partner can convey the entire partnership's interest in real property. *Dotson v. Grice*, 98 N.M. 207, 211, 647 P.2d 409, 413 (1982). Clearly, then, a joinder of all partners could effect a conveyance. Crooks, as attorney in fact for all the partners, could also convey the partnership's interests.

■ Ultimately, however, the Court finds the whole issue of the power of attorney to be irrelevant. It is undisputed that the land was deeded to the Villa Palomar Joint Venture. The land became joint venture property. The joint venturers were CIL and CST. Crooks, as agent of CIL, was an agent of Villa Palomar. As agent of Villa Palomar he could convey or encumber the Villa Palomar property without the consent of CST or its partners. *Id.*

*3. Whether Security Federal had actual and constructive knowledge of the rights and title of CST Group.*

CST claims that Security Federal had actual and constructive knowledge of the rights and title of CST group and therefore had a duty to investigate further, which it failed to undertake. Specifically, CST claims that the title binder revealed the interest of CST group yet Security Federal never obtained a copy of the power of attorney until after the last loan closed, and never obtained copies of the CST partnership agreement or the Villa Palomar Joint Venture Agreement. Had Security Federal obtained these documents, CST claims that it would have been clear that the land was partnership property, that Crooks had nothing to encumber or convey, and that limitations on Crook's authority would have been obvious.

As discussed above, the record is clear that the land was *not* property of CST partnership. The land was joint venture property. Crooks, as a joint venturer had the capacity to and in fact did encumber the property.

Furthermore, it is not relevant that Security Federal obtained the power of attorney after the last loan was closed, if this in fact is true.[2] Whether Security Federal saw the power or not it is deemed to have had notice of it from the time it was recorded. *See* § 14–9–2 N.M.S.A. (1978). (Recorded writings affecting title to real estate "shall be notice to all the world of the existence and contents of the instruments so recorded.") In any event, Security Federal was aware of the power before the first loan closed. *See* Deposition of Bobby Nafus, page 8, lines 1–9.

Had Security Federal actually obtained the CST partnership agreement or the Villa Palomar Joint Venture Agreement, those documents would not have demonstrated any limitations on Crook's authority. First, the CST agreement makes no reference either to Crooks or to the joint venture. It does establish, however, that the purpose of CST is to develop lots and build single-family homes on the land. Crooks' actions appear to be in line with these stated purposes. Second, the Villa Palomar agreement states its purpose as "acquiring financing for the construction and selling of custom single-family residences" on the land, and specifically states "CST agrees to permit the use of nine (9) of the lots currently owned by CST Group to be used as security for construction financing." Thus the agreement specifically anticipated encumbering the property. Crooks' actions were completely consistent with the agreement.

Finally, whether there was a duty of further investigation is a legal question. Under the facts of this case the Court finds none. Crooks had the authority to act for Villa Palomar, and did act. Even if the power of attorney had been the source of this authority there was no duty to go beyond its language. *See Parton v. Robinson*, 574 S.W.2d 679, 682 (Ky.App.1978).

---

**2.** The Court does not so find. Nafus's deposition indicates he received a power of attorney. CST's attorney's affidavit demonstrates that a copy of the power was sent to Security Federal in July, 1987. It is unclear whether Nafus saw another copy before July, 1987.

Its language allowed Crooks to encumber the land.

*4. Whether Security Federal exercised reasonable care in the exercise of its obligations.*

In support of this argument CST alleges that the power of attorney document would not have been found effective to encumber real estate according to the standard practice of Bernalillo County title companies. CST also argues that the joint venture documents and "authorization" should have been obtained. CST has provided no affidavits or other evidence of the standard practices of title companies in Bernalillo County, nor has it provided evidence that obtaining a joint venturer's "authorization" is common practice. CST, therefore, has failed to establish any duty. On the other hand, the Nafus deposition indicates that loan packages consisting of a note and mortgage are sent to the title company, page 12, lines 14–16, and the documents are signed and executed there, *id.* line 13. After closing, a title policy is returned, *id.* page 10 lines 13–14. The Court cannot find this procedure negligent as a matter of law. Therefore, CST fails to meet its burden on this theory. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553.

CST also claims that negligent acts of Security Federal resulted in the conversion of all proceeds. CST, however, has come forward with no evidence to support this claim as it pertains to proceeds of the sale of houses: there is no evidence that Security Federal ever had control or possession of the sales proceeds, nor is there evidence that Security Federal had a duty to anyone regarding them. Therefore, as applied to sales proceeds the Court finds no negligence.

There were two categories of loans, those to CIL alone and those to CIL and CST d/b/a Villa Palomar. For the loans to CIL alone Security Federal had no duty to ask Villa Palomar, the prior owner of the land, for its advice on how the loan proceeds should be disbursed. There being no duty, there can be no negligence. Furthermore, by dealing with CIL, Security Federal was in fact dealing also with Villa Palo-

mar through its agent. Villa Palomar is therefore estopped from claiming that disbursements were improperly made. For the joint venture loans the proceeds were paid to CIL, a joint venturer. Payment to an authorized agent constitutes payment to the principal, if the agent is authorized to collect. *Bozza v. General Adjustment Bureau,* 103 N.M. 200, 204, 704 P.2d 454, 458 (Ct.App.1985). Crooks was an agent for the joint venture. No limitations on his authority were made known to Security Federal. Surely there cannot be a duty imposed on lenders to ensure that funds loaned to a partnership will be applied as each partner assumes they will be. The Court finds that any duty Security Federal had ended when it paid the proceeds of the joint venture loans to Crooks.

*5. Whether CST Group acted to protect its interests upon learning of improprieties in the loan transactions and the use of a fraudulent power of attorney.*

This issue is not relevant to whether Security Federal was a bona fide purchaser for value. Any actions by CST would have occurred after Security Federal had already obtained its bona fide purchaser status.

The Court finds, however, that the power of attorney was not revoked in writing until after the last loan was closed. Until revoked in writing a power is deemed valid with respect to a bona fide purchaser or incumbrancer for value and without notice of the revocation. § 47-1-18 N.M.S.A. (1978). Therefore, CST's actions before recording the revocation are not relevant.

CST has failed to demonstrate that there are any genuine issues of fact on any matters relevant to Security Federal's motion for summary judgment. The sole question remaining for the Court is whether Security Federal is "entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

In New Mexico, a bona fide purchaser for value without notice of shortcomings that could be raised by a previous owner, or which would become apparent from a reasonable examination of the record, takes free of such defects. *Rael v. Cisneros,* 82 N.M. 705, 708, 487 P.2d 133, 136 (1971).

*See also Leonard Farms v. Carlsbad Riverside Terrace,* 90 N.M. 34, 37, 559 P.2d 411, 414 (1977). (Equity will not divest or impair the title or interest of a bona fide purchaser for value without notice of defect.)

The true rule ... is that absent actual notice, where the facts brought to the knowledge of the intending purchaser are such that in the exercise of ordinary care he ought to inquire, but does not, and his failure so to amounts to gross or culpable negligence, he will be charged with a knowledge of all the facts which the inquiry, pursued with reasonable diligence, would have revealed. Want of ordinary care alone will not charge him. The circumstances must be such that the failure to make the inquiry suggested by ordinary care will convict the intending purchaser of gross or culpable negligence if he is to be visited with all the consequences of having made the purchase with actual knowledge of the facts.

*Sawyer v. Barton,* 55 N.M. 479, 485–86, 236 P.2d 77 (1951).

From an examination of the record it is clear that Security Federal had no actual knowledge that Crooks was unauthorized to do what he did. In fact, it appears to the Court that he in fact could encumber the land. *Dotson,* 98 N.M. at 211, 647 P.2d at 413. The Court finds no negligence on Security Federal's part, let alone gross or culpable negligence. Security Federal is a bona fide purchaser for value under its mortgage, and its interest cannot be defeated. Summary judgment is appropriate.

Finally, one of CST's theories of recovery is slander of title. "Malice is an essential ingredient in a claim of slander of title." *City of Hobbs v. Chesport, Limited,* 76 N.M. 609, 616, 417 P.2d 210 (1966). Security Federal moves for summary judgment on the grounds that the evidence shows, at most, negligence. CST has not come forward with any additional materials to support malice, an essential element of its case. Summary judgment is proper. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553.

IT IS ORDERED that Security Federal's motion for summary judgment on the counterclaim of CST Group is hereby granted.

IT IS ORDERED that Security Federal shall prepare a form of judgment in conformity with this memorandum opinion within 10 days.